IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TYRONE ROBINSON,

                        Plaintiff,                        OPINION AND ORDER

    v.

                                                     22-cv-282-wmc

JOAN HANNULA,

                        Defendant.

Tyrone Robinson, who is representing himself, claims that Joan Hannula, a physician at Stanley Correctional Institution ("SCI"), was deliberately indifferent to his rash and skin irritation in 2017 and 2018. The court previously granted Robinson leave to proceed against Hannula on an Eighth Amendment deliberate indifference claim. (Dkt. #7.) Before the court are the parties' cross-motions for summary judgment on Robinson's claims. (Dkt. #26 and Dkt. #29.) Because no reasonable jury could find that Hannula acted with deliberate indifference to Robinson's skin condition on the record before it, the court will enter summary judgment in Hannula's favor.[1]

UNDISPUTED FACTS[2]

**A. Background**

At all times relevant to this case, plaintiff Tyrone Robinson was in the custody of the Wisconsin Department of Corrections ("DOC") at SCI. Robinson alleges that he is

---

[1] For this reason, the court will also deny Robinson's motions to amend the discovery record (dkt. #43 and dkt. #49) as moot.

[2] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings, responses, and other evidence.

allergic to carbamazepine, a prescription anticonvulsant and mood-stabilizing medication.

During the same timeframe, defendant Joan Hannula was employed as a physician by the DOC at SCI.  In her role as a physician, Hannula was responsible for providing medical services to inmates in accordance with the DOC's standards of practice and community standards, along with policies, procedures, and standards set by DOC's Bureau of Health Services.  Generally, Dr. Hannula was responsible for attending to the medical needs of inmates presented to her for treatment, diagnosing and treating their illnesses and injuries, prescribing and managing their medications, and arranging for professional consultation with outside providers as needed.

On July 28, 2017, a non-defendant psychiatrist, Dr. Betsy Luxford, noted that it was unclear whether Robinson was experiencing a bipolar spectrum illness or if his mood symptoms were "as a result of his world view and personality structure."  (Dkt. #45, at 4.) Regardless, she prescribed Robinson carbamazepine as a mood stabilizer.  Although it is uncommon for patients who receive carbamazepine to develop skin eruptions, those who do typically experience those symptoms within two weeks after beginning to take the medication.

**B. Robinson's Rash Onset**

Robinson was first seen at SCI's Health Services Unit ("HSU") on October 8, 2017, for complaints of an itchy rash on his legs, arms, hands, and groin.  According to Robinson's report at that time, the rash began on his hands and spread from there, and he was also experiencing throat and taste problems.  Upon examining Robinson, an HSU nurse observed the presence of a red, raised rash, but no open areas or drainage.  Robinson was

2

provided antihistamines to treat the rash and was instructed to follow up with nursing in the morning.

At his October 9 follow-up visit the next day in the HSU, Robinson stated that he was still experiencing an itchy rash. He also complained of a sore left ear and sore throat. At that visit, an Advanced Practice Nurse Prescriber ("APNP") examined Robinson's rash. The APNP noted Robinson's throat and ears displayed signs of redness, and he had a raised rash on his hands, forearms, buttocks, legs, and lower abdomen. Again, there were no open wounds visible on any of the rash areas. Robinson was then advised to increase his fluid intake, along with orders placed for him to receive: Ibuprofen for his throat discomfort; Dermarest medicated lotion and hydrocortisone for application on the rash; and additional doses of antihistamines. He was further instructed to follow up with nursing four days later. Accordingly, Robinson was seen again for his rash in the HSU on October 12 and 13.

At his October 12 visit, Robinson complained that the rash had spread to his thighs and arms, and that he was now experiencing dry lips, although his throat complaint had resolved. The HSU nurse who Robinson saw at that time confirmed that there were small, raised bumps on his arms and legs. Robinson was offered a packet of Vaseline, as well as the opportunity to soak in a tub, which he declined, stating that he had just taken a shower.

At his October 13 follow-up visit, Robinson was again seen by an APNP. After again observing a large amount of raised, red rash on his abdomen, legs, buttocks, arms, and hands, the APNP sent Robinson to the emergency room at St. Joseph's Hospital in Chippewa Falls, Wisconsin, to be seen for hives. At the hospital that same day, Robinson

was seen by another non-defendant, Dr. Joseph Williams, who diagnosed an "allergic rash." (Dkt. #45, at 8.)  Dr. Williams recommended that Robinson receive a five-day prescription of prednisone -- a corticosteroid -- beginning the next day, October 14.

Upon Robinson's return to SCI, Dr. Williams' recommendations were reviewed by yet another non-defendant, APNP Judy Bentley, who ran through the recommendations with Robinson as well.  Bentley then issued Robinson the prednisone recommended by Dr. Williams, as well as Men-Phor for topical use.  According to Robinson, he also requested a blood test at that time to determine the cause of his allergic reaction.  (*Id*. at 9.)

On October 16, 2017, Robinson was again seen in the HSU by a nurse for follow-up on his rash.  While noting that the rash was resolving, that nurse still observed some itchy skin, and although the raised pink rash was no longer present on his legs, Robinson also complained of dry, peeling skin on his penis.  Ultimately, the nurse advised Robinson to let his body heal naturally.  Four days later, Robinson was seen for yet another follow-up exam in the HSU, where he reported feeling "so much better," without any raised rash, swelling, or sore throat.  (*Id*. at 13.)  Upon examination, Robinson appeared to have a few, scattered eczematous patches on his legs, but denied that they were itching.

On October 29, however, when Robinson was again seen in the HSU for complaints that his rash had returned, he was also experiencing swollen, warm-to-the-touch, dried crusty drainage around his ears and was back to being itchy all over.  Upon examination, Robinson presented with a blotchy rash over most of his body that was red and raised. Robinson further told the attending nurse that the rash had begun to return the previous night and became worse when applying moisturizing cream.  The on-call nurse then

contacted a non-defendant on-call physician, Dr. Rothlisberger, who placed orders for antibiotic, corticosteroid, and antihistaminic medications for Robinson to keep on his person for treatment of the rash.

### C. Robinson's Initial Treatment by Dr. Hannula

The following day, October 30, 2017, Dr. Hannula first saw Robinson for the rash he had developed earlier that month.  Robinson told Hannula that after a period of improvement, his rash had returned in an even more severe fashion.  Upon examination, Hannula did not see any rash on his face, but she did observe flat discolored areas of skin and small raised bumps on his arms, trunk, and lower extremities.  The skin on Robinson's lower leg was also extremely dry.  At that point, Dr. Hannula assessed Robinson's condition as "eczema with a possible allergic reaction," and she wanted to ensure that there was no underlying scabies.  (Dkt. #32, at 9.)  Accordingly, she instructed Robinson to continue taking prednisone for a week, start using betamethasone cream and cetirizine (a corticosteroid and antihistamine, respectively), and discontinue cephalexin and Dermarest.  Dr. Hannula also told Robinson to stop using state-provided soap and to shower every other day, applying moisturizer in between the corticosteroid cream.  In addition, Hannula placed an order for Robinson to receive Ceta-Klenz skin cleanser, Hydrophor skin ointment, and Vaseline as needed.  A nurse was to apply betamethasone cream to Robinson's back twice a day until his skin cleared.  Finally, Hannula asked Robinson to follow up with her one week later.

On November 6, Dr. Hannula saw Robinson again, and he reported feeling significantly better, but still experiencing bothersome itching at night.  Hannula's

examination showed that Robinson's condition had improved across the board, and she instructed him to continue his treatment plan.  She also placed additional orders for doxepin, an antidepressant and nerve pain medication that can reduce itching, as well as for lidocaine and Men-Phor.

Dr. Hannula next saw Robinson on November 13.  At that visit, he reported some improvement, but was still experiencing substantial itching at night.  Upon examining him, Hannula again noted significant, generalized improvement, but she still observed some red, raised areas and dry skin.  At that point, Hannula's plan was for Robinson to continue taking a corticosteroid cream for six months and follow up with her in two weeks.  She also ordered an increase in Robinson's doxepin dosage.

On November 22, Robinson was seen in the HSU by a nurse after he reported eczema on his scalp that was bleeding and itchy.  Upon examination, the nurse noted the presence of scabs that appeared to be healing.  After consulting with the advanced care provider on call, Robinson was advised to continue using the corticosteroid cream on his scalp.

Two days later, on November 24, Robinson was again seen in the HSU for complaints of eczema -- this time in his chin area -- and stated that he felt as if the rash was "taking over his body."  (Dkt. #33-1, at 16.)  During the examination, Robinson was not scratching his rash, but he appeared to be mildly anxious when discussing it.  Still, the nurse who examined him did not see eczematous patches anywhere else on his face, and advised Robinson to apply hydrocortisone cream to his chin area, avoid soaps, and use water to clean the area.  He was also told to follow up with a physician the following week,

or sooner with nursing if needed.

On November 26, Robinson was again seen by an HSU nurse due to complaints of pain and itching related to a rash on his buttocks, groin, scalp, and chin. Robinson also told the nurse that he thought Dr. Hannula was going to increase his doxepin dosage. He further requested that a skin culture be taken. The nurse who saw Robinson scheduled him for a follow-up exam the next morning and for a consult with an advanced care provider. At that follow-up, Robinson continued to complain of severe rash-related pain and again requested a skin culture. The nurse who saw Robinson then consulted Dr. Hannula, who told the nurse that Robinson should avoid using soap and instead use e-Klenz and Hydrophor for his dry skin. She also explained that Robinson should avoid picking at the dry areas. After the nurse relayed Hannula's comments, Robinson requested a skin culture from an HSU nurse for a third time.

Two days later, on November 29, Dr. Hannula saw Robinson herself for a fourth time. At that visit, Robinson reported some improvement, though he still had some tender lesions on his buttocks, face, and legs. Robinson then requested that his doxepin dosage be increased because he was not experiencing any side effects and found it beneficial. Dr. Hannula's examination suggested that Robinson's rash had largely resolved but his skin was still very dry, and there was still redness around his thigh area. Robinson had also developed multiple red pinpoint lesions on his legs, groin, buttocks, and face. Although Robinson's eczema had improved, because the rash was not totally resolved, Dr. Hannula decided to perform a skin biopsy. She also cultured a lesion to address Robinson's folliculitis. Finally, Hannula instructed Robinson to continue using corticosteroid cream

and an increased dosage of doxepin, as well as begin using an antibiotic.  She then scheduled him for a skin biopsy, a throat culture, and a follow-up two weeks later.

### D. Robinson's Subsequent Skin Treatment

The skin biopsy was conducted on November 30, and Robinson was seen in the HSU on December 3, 2017, for cracked skin on the bottom of his foot and an itchy, sore area between his toes.  There was no sign of an infection, but the nurse observed that his foot appeared dry, and there was an "open area" between his toes.  (*Id.* at 11.)  Accordingly, Robinson was issued an antifungal skin cream, antibiotic skin cream and gauze for self-care.  At subsequent follow-ups for his foot condition, Robinson was also instructed to use a petroleum-based salve and run gauze between his toes, with changes twice a day, and later, to soak his feet in a foot basin provided by the HSU.

The results of Robinson's November 30 skin biopsy were first reviewed on December 4, 2017 by a non-defendant pathologist, Dr. Patrick Heintz, who prepared a report summarizing his findings that same day.  According to Heintz, the biopsy showed that Robinson had likely experienced a "spongiotic drug eruption," but that an eczematous or allergic contact dermatitis was also in the histological differential diagnosis.  (*Id.* at 35-36.)  Heintz further considered the possibility that Robinson was experiencing the early stages of an autoimmune blistering disease, suggesting that an additional biopsy could be submitted for direct immunofluorescence testing if clinically appropriate.

After receiving Dr. Heintz's report, Dr. Hannula discontinued Robinson's carbamazepine prescription on December 8 in an attempt to rule out another possible irritant.  That same day, Robinson was also taken to the HSU for education on special

8

restrictions that would allow him to wash his clothing in his housing unit in a further attempt to rule out other irritants. Robinson received a copy of the restriction form and notification that his carbamazepine had been discontinued.

On December 14, 2017, Dr. Hannula saw Robinson for the scheduled follow-up on his skin biopsy. At that visit, Robinson's condition had improved significantly, with the rash on his torso having completely cleared up, and the remaining problems being dry scalp and dry feet. Vaseline, gauze, and DuoDerm cream were applied to affected areas, and Robinson was advised to keep his feet dry for the next three to four days. At an HSU follow-up for Robinson's foot fissures four days later, December 18, Robinson's condition appeared to have improved further, and his feet appeared to be healing.

At a subsequent HSU visit on December 21, however, the nurse reported the presence of some new, cracked skin fissures on the sides of Robinson's heels. After consulting with Dr. Hannula, Robinson was issued orders to mix a small amount of steroidal and antifungal ointments and apply them to his feet daily for two months. Hannula also instructed Robinson to use ammonium lactate moisturizer twice daily for two months. In response to Robinson's dry scalp, Hannula ordered him T-gel shampoo to be used every other day for two months. Hannula then placed a small amount of medical glue to the fissures on the sides of Robinson's heels. The next day, an HSU nurse evaluated Robinson again for his foot pain. Though he had new fissures on the bottoms of both his feet, they did not appear infected. As a result, he was given temporary restrictions requiring him to cease work, use a wheelchair, and sleep in a lower bunk. At a December 26 HSU appointment, the nurse who saw Robinson noted fewer cracks on his feet.

Nevertheless, in the first three weeks of January of 2018, Robinson was again seen by nurses in the HSU on four, separate occasions for complaints involving side effects from an allergic reaction, dry nail beds, complaints of foot pain, and ongoing rashes.  In response, Robinson was advised to increase his fluid intake, continue with the treatment plan he had been prescribed, and await his follow-up with Dr. Hannula on January 18, 2018.

At that visit, which was the final encounter Hannula had with Robinson to address his rash issues, she noted significant improvement of the eczema on his trunk and legs, dermatitis in his beard area, and fingernail pitting.  She also observed hyperkeratosis on the soles of his feet, including some fungal involvement.  Hannula instructed Robinson to continue using hydrocortisone cream and prescribed him terbinafine, an antifungal drug intended to treat athlete's foot.

In the following weeks, Robinson told his psychiatrist that he was doing well with the medication primary care had prescribed him to replace carbamazepine, which he had to stop taking due to an allergic reaction.  However, two months later, records show that Robinson told his psychiatrist he wanted to be off medication altogether, because he wanted "to continue healing from the eczematous dermatitis flare up he just went through."  (Dkt. #33-1, at 54.)

## OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party"

to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Here, plaintiff was granted leave to proceed against Dr. Hannula on a single, Eighth Amendment deliberate indifference claim. Both parties seek summary judgment on that claim.

The court reviews the parties' cross-motions for summary judgment "construing all facts, and drawing all reasonable inferences from those facts, in favor of . . . the non-moving party." *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008) (quoting *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 748 (7th Cir. 2007)). However, the court "may not grant summary judgment for either side unless the admissible evidence as a whole -- from both motions -- establishes that no material facts are in dispute." *Bloodworth v. Vill. of Greendale*, 475 F. App'x 92, 95 (7th Cir. 2012). Though the parties disagree on the causes of plaintiff's skin condition, the *material* facts in this case are undisputed.

The Eighth Amendment gives prisoners the right to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements: (1) an objectively serious medical need; and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). For purposes of summary judgment, defendant concedes that plaintiff's skin condition was objectively serious. (Dkt. #30, at 16.) Accordingly, the court only needs to address the subjective prong of that test.

11

"Deliberate indifference" means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Under this decidedly high standard, acts of deliberate indifference require more than negligence, or even gross negligence, but require something less than purposeful acts. *Farmer v. Brennan*, 511 U.S. 825, 835-36 (1994).  Thus, the threshold for deliberate indifference to an objectively serious medical need is met where:  (1) "the official knows of and disregards an excessive risk to inmate health or safety"; or (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and he or she draws that inference yet deliberately fails to take reasonable steps to avoid it. *Id.* at 837.

In the medical context in particular, a reasonable jury may infer deliberate indifference if the defendant's conduct is "blatantly inappropriate," *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996), or "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).  In other words, "[a] constitutional violation exists only if no minimally competent professional would have so responded under those circumstances." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (internal quotations omitted).  For plaintiff to prevail on a medical-care claim under the Eighth Amendment, therefore, he must prove four things:  (1) the prisoner needed medical treatment; (2) the defendant knew that the prisoner needed medical treatment; (3) the defendant consciously refused to take reasonable steps to provide the needed treatment;

and (4) the defendant's action or inaction harmed the plaintiff.  Federal Civil Jury Instructions of the Seventh Circuit § 7.17 (2017); *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023).  The court is to look at the "totality of [the prisoner's] medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

Here, the first two elements are met:  plaintiff's need for medical care was known to defendant by October 30, 2017, when she first saw him.  However, given Dr. Hannula's ongoing, active treatment of Robinson's medical conditions following presentment on October 30, a reasonable jury could neither find she consciously refused to take reasonable steps to provide needed treatment, nor that defendant's personal actions or inactions *caused* his injury.  *Herzog v. Vill. of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002) ("[T]he ordinary rules of tort causation apply to constitutional tort suits.").  To the contrary, the record is replete with evidence that within *one month* defendant met with plaintiff at least four times, in addition to multiple, periodic interventions during that same 30-day period by other APNPs and nurses, prescribing a variety of treatments including hydrocortisone for his rash, Benadryl for itching, and varying other medicines, ointments and creams when no set of medications provided plaintiff complete relief, as well as ongoing regular application of cream by nursing staff to plaintiff's affected skin, discontinuing medications that he might be reacting to, and ultimately referring plaintiff out for a skin biopsy by a pathologist.  Finally, within days of receiving the pathologist's report, defendant discontinued plaintiff's carbamazepine medication, something his psychiatrist had prescribed, not defendant.

13

Causation is normally a question for the jury to decide. *Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010) ("only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation"). However, a defendant cannot be held liable under the Eighth Amendment "if the remedial step was not within [his or her] power." *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012). As a result, even if a reasonable jury could find on this muddled record that the carbamazepine prescription was a contributing factor to plaintiff's multiple symptoms, as he now suggests, defendant did *not* cause plaintiff to take it, and in fact, was the one who discontinued it.

Nevertheless, plaintiff claims that defendant Hannula was deliberately indifferent to his rash and its effects by: (1) delaying diagnostic testing for his skin condition; and (2) "doggedly" persisting in a course of treatment that she knew to be ineffective. (Dkt. #26, at 9.) *First*, even when the evidence of record is viewed in the light most favorable to plaintiff, it is clear that Dr. Hannula did not needlessly delay ordering diagnostic testing for plaintiff's skin condition. Despite plaintiff's hearsay assertion that his treating physician at St. Joseph's Hospital instructed SCI staff to determine the source of plaintiff's allergic reaction (*id*. at 7), the medical records from that visit are totally devoid of any indication that was the case. (Dkt. #33-1, at 45-46.) Moreover, even if there were admissible evidence to support plaintiff's contention, the fact that another medical provider reached a different conclusion about what treatment or testing to provide plaintiff is not, on its own, evidence of deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Plaintiff also takes particular issue with the amount of time that elapsed between his initial consultations with HSU staff for his rash, his requests for diagnostic testing, and when the testing actually took place.  Certainly, an "inexplicable delay" that exacerbates a prisoner's medical condition or unnecessarily prolongs suffering can show deliberate indifference.  *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (quotation marks omitted).  "[E]ven brief, unexplained delays in treatment may constitute deliberate indifference."  *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (quotation marks omitted).  However, the evidence of record suggests that Dr. Hannula ordered a skin biopsy and lesion culture to address plaintiff's rash and folliculitis *within one month* of beginning to treat his condition, during which she treated and explored a variety of explanations for plaintiff's improvement but did not obtain a complete resolution of his many symptoms.  And as to the latter test, defendant ordered a skin biopsy within *three days* of plaintiff's first documented request for it.  On this record, no reasonable jury could infer that defendant Hannula was deliberately indifferent.  *Estelle*, 429 U.S. at 107 ("[W]hether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.").

Further, in circumstances where medical care is delayed, the Seventh Circuit has "required that the plaintiff present 'verifying medical evidence' that the delay, and not the underlying condition, caused some harm."  *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (quoting *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013)); *Petties*, 836 F.3d at 730-31 (a delay in treatment only constitutes deliberate indifference where a plaintiff presents independent evidence that the delay exacerbated an injury).

Here, the medical evidence of record -- in particular, the results of his skin biopsy -- suggests that his rash may have been caused by an adverse reaction to medication, eczema, *or* contact dermatitis, and even if plaintiff's skin condition was caused at least in part by an allergy to carbamazepine -- or, as he also suggests, was actually Stevens-Johnson syndrome provoked by carbamazepine -- defendant Hannula discontinued plaintiff's prescription for the drug almost immediately upon receiving the results from his biopsy.[3]   Thus, no reasonable jury could conclude that Hannula was deliberately indifferent to plaintiff's complaints regarding his skin condition against this backdrop of:  plaintiff's nearly-daily visits to the HSU to treat his skin condition in November of 2017; the lack of any evidence that his testing was somehow delayed by Hannula, or that such a delay aggravated his condition; and the undisputed fact that plaintiff's condition had shown improvement even before the biopsy was ordered.

*Second*, even if plaintiff disagreed with defendant Hannula's initial eczema diagnosis and choice of medications to treat his rash, no reasonable jury could find defendant acted with deliberate indifference to his skin condition on that basis.  Plaintiff is not a medical professional, so he "is not competent to diagnose himself, and he has no right to choose his own treatment." *Lloyd v. Moats*, 721 F. App'x 490, 495 (7th Cir. 2017).  In fairness to

---

[3] Stevens-Johnson syndrome is a rare, serious disorder of the skin and mucous membranes that generally manifests as a reaction to medication.  Stevens-Johnson Syndrome, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/stevens-johnson-syndrome/symptoms-causes/syc-20355936 (last visited May 3, 2024).  Carbamazepine is one of several medications that is commonly linked to the emergence of Stevens-Johnson syndrome.  Stevens-Johnson syndrome, NHS, https://www.nhs.uk/conditions/stevens-johnson-syndrome/ (last visited May 3, 2024).  Plaintiff has moved to admit photographic evidence into the record to support his contention that he suffered from Stevens-Johnson syndrome.  (Dkt. #43.)  Again, given the undisputed facts in the record, plaintiff's inability to diagnose himself, and defendant's entitlement to summary judgment, the court will dismiss that motion as moot.

plaintiff, a prison official's decision to persist in a course of treatment *known* to be ineffective can constitute a departure from minimally competent judgment. *Petties*, 836 F.3d at 729. However, the Eighth Amendment does *not* give a prisoner the right to specific treatment or a medical provider of his choosing on demand. *Id.* at 730. Further, medical professionals are "entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)).

In short, plaintiff's disagreements with defendant Hannula's medical decisions do not create a triable issue. Similarly, whether she complied with DOC policies for healthcare providers is not determinative of whether she violated plaintiff's constitutional rights. The record establishes that: (1) plaintiff was consistently treated for his skin condition after raising it to staff at SCI's HSU; (2) Dr. Hannula always acknowledged and treated plaintiff's complaints regarding his skin conditions, even if their causes and the proper course of treatment remained uncertain; and (3) Hannula used her medical judgment in ordering medications, treatments and diagnostic testing to treat plaintiff's condition. Finally, to the extent that plaintiff would impute his ongoing carbamazepine usage to Hannula, it is undisputed that plaintiff's psychiatrist placed him on the medication over two months before he began to show any signs of a skin condition for which defendant was eventually asked to treat him after other APNPs and nurses were unable to find the causes or ultimate combinations of treatments necessary to provide plaintiff long-term relief. Even if, in hindsight, defendant was aware of the risk that carbamazepine could lead to a

patient developing Stevens-Johnson syndrome, she is entitled to deference in her reasoned

medical decision-making over 30 days.  Accordingly, she is entitled to summary judgment

on plaintiff's Eighth Amendment claim.

ORDER

IT IS ORDERED that:

1) Defendant's motion for summary judgment (dkt. #29) is GRANTED, plaintiff's motion for summary judgment (dkt. #26) is DENIED, and judgment shall be entered against plaintiff Robinson on his Eighth Amendment claims.

2) Plaintiff's motions to amend the discovery record (dkt #43 and dkt. #49) are DENIED as moot.

3) The clerk of court is directed to enter final judgment accordingly and close this case.

Entered this 17th day of September, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge